Thank you, your honor. Todd Kerr, appearing on behalf of appellant Taylor R. Coleman. With me is Clinton Garrett. We're with the law firm of Perkins Coie. Your honors, I was speaking with opposing counsel. We both agree we could probably talk for three or four hours. We only have ten minutes. So I'll start with this sentiment. Judge Henry Friendly of the Third Circuit said that bankruptcy proceedings... I stand corrected. If I throw out a quote, I should get the circuit right. Said that the conduct of bankruptcy proceedings not only should be right, but they must seem right. These proceedings were unseemly in the extreme, and there was nothing right done with respect to Mr. Coleman's legal rights. The greatest and the biggest example of that had to do with the taking of Mr. Coleman's real properties. As part of the confirmation order, Judge Haynes of the Arizona Bankruptcy Court ordered the transfer of 11 parcels of real estate in four different states. The properties had a value of somewhere around $20 million. What's your basis for saying that? Obviously he didn't pay anything near that. Well, that was one of the estimates that was provided during one of the plans through this confirmation process. By whom? I can't remember who it was. We provided lots of different valuations. But whether the properties are worth $5 million or a fraction of the $20 million that they were thought to be worth, those properties, the salient point was they were not owned by these debtors. They were owned by limited liability corporations that were controlled by Coleman. Those properties of those LLCs were neither owned by Newcastle or any of the debtors in this action, nor were they part of the bankruptcy estates. And therefore, they weren't subject to Judge Haynes' jurisdiction. Because he had no jurisdiction, because the properties were not part of the bankruptcy estate, the order transferring those was null and void. The confirmation order, we believe, therefore must be set aside at least in part to recognize that the bankruptcy court had no jurisdiction over those properties. We've given you case law that this court must set aside an order that's null and void. That's an important argument, Your Honors, because they have no response to it. And that argument, that fact is impervious to any of the mootness arguments or any of the trial court discretion arguments that they have placed before you. You're talking about legal title, aren't you? Yes. Okay. The insider's only response to this is that the real properties were intended to be transferred pursuant to a settlement agreement that happened back in 2004. It was an agreement where there were lots of parties involved. But that is what also makes this case so insidious. The insiders, the debtors, are now taking the position that the 2004 settlement and that 2004 plan is no longer valid to them. They say they don't have to abide by any of their obligations to give any of the benefits that Mr. Coleman contracted for under that agreement. So if the 2004 settlement and plan is no longer enforceable against these debtors, then how can it be enforceable against Mr. Coleman? Now, there were two plans, right? What were the dates of the two plans? Well, there were several plans, Your Honor. Were there more than two approved plans? There was a plan that was initially filed. The whole case started in 2004. And this is one of our major points. That plan was filed, confirmed, and became substantially consummated shortly after in 2004. Then there was a successive, a follow-up plan filed in 2007. Those were withdrawn. There were, I believe, there was another plan filed in 2008, which was then modified to become the 2009 plan that we're here today. And how many confirmed plans were there? There's two confirmed plans. The 2004 plan and the 2009 plan. And so the 2009 plan replaces the 2004 plan? Yes. And that's the big problem that we think they have, because that raises the other major issue that we have before the panel, which is under Section 1127B of the Bankruptcy Code, it is improper to file a successive or a second bankruptcy plan for the sole purpose of changing or contradicting a substantially consummated plan, which there is no dispute in the record that the 2004 plan was substantially consummated. The parties stipulated that in their joint pretrial order. But as I understand it, because of some flaws in the estimates as to the money that was likely to come in, the amount of debt and so on, the 2004 plan was not workable. Well, and that's an interesting point. That's not what they said, Your Honor, when they filed the 2007 plan. Remember, most of that testimony comes two years after they tried to start modifying the plan. One of our big problems is that the judge, we believe, accepted statements two years after the fact over contemporaneous statements that were made in 2007 about the purpose of the 2007 plan. But the 2007 plan was withdrawn, was it not? Yes, it was. But it provides evidence of why they were filing these plans. And under 1129A3, these parties must come in and show good faith both at the time of the filing of their initial petition, which is the 2007 filing, and also that the plan that eventually was confirmed was also filed in good faith in 2009. So they have to show good faith at the time that they filed the plan in 2007. We don't believe they did. There are statements in the record that when they came to the court in 2007, they said, we're profitable. There have been no defaults under the 2004 plan. We can pay our vendors in the ordinary course. The only reason we are coming to do that is because we want Mr. Coleman to surrender 50% of his equity so that we can reduce the outstanding amount of the debt. Mr. Coleman was under no obligation to do that. He had made his deal in the 2004 plan, and we submit by them coming in and filing that plan in 2007 that was improper. Counsel, may I just ask you, since your time is limited, you seem to put a good deal of faith in the Samsell case. Your argument that Mr. Franks was not a good faith purchaser, but isn't this case clearly distinguishable from the Samsell case? In fact, Mr. Franks was not an agent of the trustee, as was the case in Samsell. There may be a small distinction between that, but we think if you look at, if you read Bitterman, if you read Donovan, there are three bases for why there needs to be heightened scrutiny applied to this case and why they have to look very closely at the insider status of Mr. Franks. Mr. Franks wasn't an insider. He was part of a group that was trying to wipe Mr. Coleman out. He was also the CEO at the time. Forget about bankruptcy law. Common law imposed common law fiduciary duties on that person to not put himself in a conflicted interest position. That's what he did by putting himself out there as the purchaser of this. And then he's doing it pursuant to a successive or a second Chapter 11 plan. And under In Re Motel, the course has said you have to require more than good faith because that is rife with chances to come in and to violate 1127B. Your Honor, I need to reserve at least a little bit of time. Okay, thank you. Let's hear from the other side, and you have reserved some time. Good morning. My name is Steve Jerome, and I have the honor to represent appellee Mark Franks, and the privilege of speaking on behalf of all joint appellees this morning. I think I'd like to focus on a couple of points that were the questions raised by the panel to my colleague, Mr. Kerr. And I think one of the points that he raised was he keeps referencing the statements of counsel and these other items in the record. We had a trial, and the trial was based on evidence that was offered and most admitted into the evidentiary record. The statements of counsel at hearings two years before were neither offered nor accepted into evidence during this trial record. And for them to then supplement and essentially comb pleadings for statements two and a half years after the trial, actually now we're approximately two years after the trial, makes it very difficult, and that's not evidence. That was not submitted to the finder of fact. Let's talk about what was submitted to the finder of fact. Let's talk about good faith, because I think the record is absolutely clear that Mr. Franks acted in good faith and entitled to the protections of 363M. Mr. Franks asked and received permission from the management board prior to even making an offer. He was then on a corporate basis excluded from all decision-making aspects related to his or any other offer. And, in fact, he had already been excluded from the entire plan process, and that is the unrebutted testimony at trial. There is no evidence that Mr. Franks was on both sides of this deal. True, he did sign the plan on behalf of the company for the filing with the court, and his testimony on that point is very clear. I did so because I received written instructions, and under my employment contract, fair to follow those written instructions, is grounds for termination with cause. It is very clear that he did everything he could to distance himself. He testified he didn't try to influence, and there is no testimony that he did try to influence the plan committee of the management board. So then you focus on value. Mr. Franks overpaid by at least 35%. I'm not sure. That puzzles me. I understand why someone would pay fair value. I understand why someone would pay more than fair value if he's uneducated about the value of the business. But you're telling me that he thought the business was worth $5 million, and he pays $7.5 voluntarily. He just says, here's $2.5 million that I don't need. I don't understand that. There are a lot of decisions made necessary to get a plan confirmed, and sometimes there's horse trading involved. And you may have to essentially make the best deal you can in the hopes of being able to salvage something. One of the difficulties that was testified about during the trial was the administrative claims, and under the Bankruptcy Code they have to be paid on the effective date, or you have to reserve the funds bills. You have to then, you know, they actually attack that as a sign of bad faith. This is you have essentially all creditors and parties in interest coming together in this case, except Mr. Coleman saying, okay, how do we salvage this problem? How do we get out of bankruptcy and avoid complete destruction? And therefore that was part of the benefit of the bargain, is he agreed to pay certain expenses. Another thing that's in the record. I understand that, and maybe you're not quite taking my point. If he's willing to pay $7.5 million, and he's not in the business of being charitable to the creditors, it's worth $7.5 million. Unless he was somehow cheated, or he didn't know what he was doing. But then even if you accept that proposition, then you have two valuations. You have the committees. Now, Mr. Franks, the unsecured creditors' committees, expert witness say, the present value of the income stream is $5 million, the present value of the consideration paid is $7 million. Or you say it's worth what the market dictates, and fair value. There is no testimony in the record that it was worth more. How do you deal with, I was interested in the form the oral argument took on the other side. He got to the sort of the good faith purchaser question really only in response to Judge Nelson's question. He starts out with the argument that these weren't the bankruptcy courts to sell because of the state of title. How do you respond to that argument? Your Honor, I think the argument is very simple. We discussed two confirmed bankruptcy plans. Under the 2004 plan, the entities that were the title holders of the real property were debtors in 2003. The 2004 plan was essentially a consolidation plan. It consolidated a myriad of operational and land-owning entities into two entities. And it transferred via that plan legal title to the real property of Castle Realty and operational title of all the operational assets to New Castle. And so at the filing in 2007, when Castle Realty filed in 2008, it was already the legal owner but for the ministerial act of signing the actual deed transfers. It was the legal owner of the real property as it had been ordered by a final non-appealable order in 2004. Well, assuming that he wasn't an agent of the trustee, he was clearly an insider, was he not? What do you do with opposing counsel's argument that he had a higher duty because he was an insider? Yes, I think Mr. Franks is an insider as defined under the bankruptcy code. I don't think we've ever disputed that. I think we've met that higher burden. And if you look at the findings of fact of both Judge Haynes and Judge Tilburg's specific concurrence with those findings of fact, you look at the fact that he was excluded from the process. You had the creditors committee separately evaluating and joining the plan. The committee's experts reviewing the financial projections and saying they're neither overstated or understated. You had the CFO testify that the projections which formed the basis of the valuation were all part of an ongoing enterprise that the board had input, he had input. They looked at market data. You look at all the different things that was done to make this as arm's length as possible. Negotiations through counsel. This was not Mr. Franks deciding to accept his own deal. Far from it. The evidence is clear as a finding of fact that he had no role in approving this deal on behalf of the debtors. He was on a corporate basis excluded from that process. So while he was an insider of the debtor, he was not an insider sitting in on the deliberations of his own plan. He was, in fact, the entity essentially treated for all purposes as any other prospective purchaser. He did not meet with counsel. He did not have discussions with the company's counsel. He had discussions in an adversarial, a collegiate adversarial, but an adversarial relationship between his personal counsel, myself, and the debtor's counsel, Stinson, Morse, and Hacker. What financial interest did those who approved the sale to Mr. Franks have in getting an increased amount of money from Mr. Franks? Well, it depends on who you ask when you say approved. A&P is the single largest creditor, except for Mr. Coleman's claim, which has been objected to, of the estate. Clearly, they have a significant financial interest in obtaining a maximum return for the creditors. As well as the official creditors committee, that is their fiduciary charge, is to look out for the interest of all unsecured creditors. You had three creditors sitting on a committee that is charged by statute with looking out for their collective interest. And not only did they do so, but they felt that this was the best and only resolution. How much information did they have when they approved the sale or voted to approve the sale? And the second question that goes along with that, was there any serious attempt to solicit competing bids? Let me take those two questions separately. The first one is how much information they had. Financial advisor, Mr. Burr, was hired in June of 2007. They had counsel. They participated in the discovery that predated the 2007 competing plans. They participated in the settlement mediation in front of Judge Case. They participated in the plan discovery that led up to the confirmation of the 2009 plan. There were literally millions of documents exchanged in discovery. And they had full access. In fact, Mr. Burr testified he had access to all the information that he ever requested. And he had access to all the data that he needed to evaluate the financial wherewithal of the company and its operations. And that's unrebutted in the record. Okay. And the second question? And the second question, I'm sorry, could you? Oh, the second question is, was there any serious attempt to solicit a competing bid, competing to Mr. Frank's bid? I think if you look at over the testimony pertaining to the summer of 2008, you had several other offers that were considered. You had Mr. Frank engaged in extensive negotiations for a joint plan with Mr. Coleman. You had lots of efforts. And I'd like to take a step back and put it in context. When you have in the spring of 2008 three parties to a settlement coming out of the mediation in front of Judge Case, Mr. Coleman, Mr. Franks, and A&MP, that was going to buy Mr. Franks out and send him home. The unrebutted testimony is Mr. Coleman breached that settlement, failed to meet its core requirements, and therefore forced the parties back into finding another alternative. And then what was that alternative? There were other offers considered by the plan committee. There was one from Pipe Dreams. There was one from, I can't recall the name of the entity. There was a second entity. And you have Mr. Franks spending a significant amount of about 60, 90 days negotiating with Mr. Coleman for a joint equity holders plan. So I think there was an effort to try to find both individuals and other participants to the process, but unfortunately it's a business that perhaps doesn't necessarily attract a lot of interest. And I see I have seven seconds, so I'll ask if anyone has any additional questions. No, thank you. I think we don't. And your timing is? There it is. Thank you very much. Mr. Curry, you've saved some time. I'll follow up on a few points. They not only failed to solicit bids, they ignored the one bid they did get by Stride News, and they were willing to pay $20 million in cash. They never even responded to it. Look at our papers. We point that all out. You had a very good question about why Mr. Franks would pay $7.3 million. It goes to the issue, we don't know what it is worth. All of the factors that he just told you was window dressing and pretext. There was no marketing. There's no independent appraisal. They never contracted or hired an investment broker, and it was a sham plan committee. We lay that out in the briefs. What am I to do with that argument in the face of a contrary finding by Judge Haynes? Well, because he ignored all of it. I mean, and the point is, and for that reason. Do we review that on a clearly erroneous standard? I mean, is it a factual proposition? No, I believe it's a legal issue because he should have been applying a higher level of scrutiny, and I don't believe that he did. There is no way, applying that heightened level of scrutiny, that you can let this sale go forward based on his insider status. So you're arguing a de novo standard? Pardon? You're arguing a de novo standard? I am arguing, yes, because of the insider status, and to be honest with you, whatever standard you want to apply, there's no way that that sale can go through. He said that he paid $7.3 million. Not really. He paid $800,000. The rest of it was funded through the operating revenues of the corporation. Your Honors, I think I'll close with this one point. In their brief, they said that the standard of review is that this must strike us as something that is wrong with the force of a five-week-old unrefrigerated dead fish. The real estate issues here stink to high heaven. There is no way it could stand, and we ask you, Your Honors, don't let them cover up that with mootness arguments and discretionary arguments. That has to be set aside at a bare minimum, and we also ask relief on all the other points that we raise. Okay. Thank you very much. Thank both sides for your helpful arguments. The Coleman case is now submitted for decision.
judges: Duffy, Nelson D. W., Fletcher W.